# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREA SUMMERS | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 21-3479 |
| | : | |
| CHILDREN'S HOSPITAL OF PHILADELPHIA | : | |

**McHUGH, J.**  September 9, 2022

## MEMORANDUM

This is an action alleging race discrimination brought by an African American woman who worked for the Children's Hospital of Philadelphia ("CHOP") for twenty years before being fired. With the record now complete, Plaintiff points to no evidence from which a rational trier of fact could conclude that race was the cause of her termination. Instead, there is substantial evidence of repeated violations of CHOP's policies that ultimately led to her termination. Evidence of racial animus is minimal or non-existent, and given Plaintiff's disciplinary history, no reasonable jury could find her termination a pretext for racial discrimination. I must therefore grant Defendant's pending motion for summary judgment.

### I.     Factual and Procedural Background

Plaintiff Andrea Summers brings a claim for race discrimination in violation of 42 U.S.C. § 1981 ("§ 1981").[1]  Ms. Summers, an African American woman, began working for CHOP as a

---

[1] I previously dismissed Plaintiff's retaliation claim under § 1981 without prejudice, stating "[i]f discovery materially changes the context in which the complaints were made, Plaintiff may seek leave to amend at that time." *See* Order, ECF 11; ECF 12. Plaintiff has not sought leave to reinstate a retaliation claim.

Despite not having sought leave to amend, Plaintiff's Response in Opposition briefs Plaintiff's retaliation claim and states that the court should "deny Defendant's Motion for Summary Judgment with respect to Ms. Summer's retaliation claim." Resp. at 14, ECF 26-1. This ignores the fact that Plaintiff's retaliation claim has been dismissed, so the Defendant did not move—and indeed, could not have moved—for summary judgment as to the retaliation claim.

part-time Nursing Assistant in December 2000. Summers Dep. 72:9-15, 79:2-4, Mot. Summ. J., Ex. 1, ECF 26-3. [2] In 2008, she became a full-time Senior Nurse Aide ("SNA") in CHOP's Neonatal Intensive Care Unit. *Id*. at 81:16-82:3. Plaintiff's job responsibilities included providing supportive care to CHOP's patients, assisting nurses with patient care, and maintaining a clean, orderly, and well-stocked nursing unit. Holly Sabatino Decl. ¶ 5, Mot. Summ. J, Ex. 3, ECF 26-5; Summers Dep. 84:12-23. [3]

CHOP has a Rules of Conduct Policy that applies to all employees. *See* Rules of Conduct, Mot. Summ. J, Summers Dep. Ex. II, ECF 26-4. The Policy sets forth a graduated discipline system with multiple levels: Level 1: General Counseling; Level 2: Oral Warning; Level 3: Written Warning; Level 4: Final Warning; and Termination. *Id*.; Summers Dep. 307:5-20. The Rules of Conduct lists levels of discipline for various violations. Rules of Conduct at 7-12. Plaintiff was aware that violation of the Rules of Conduct could result in discipline that included termination. Summers Dep. 307:25-308:4.

    a. *Discipline Prior to Plaintiff's Supervision by Ms. Sabatino*

From 2000 to 2017, Plaintiff was subject to numerous instances of discipline. These included counseling for lateness and unscheduled absences. S*ee e.g.* Mot. Summ. J., Summers Dep. Ex. H, Feb. 14, 2002 (Level 1: counseling for excessive absenteeism); Ex. J, Jan. 6, 2005

---

[2] I note that on the first page of Plaintiff's Response in Opposition to the Motion for Summary Judgment, ECF 29, Plaintiff's counsel refers to a "Declaration of Andrea Summers." ECF 29. But in the text of the Memorandum, Plaintiff's counsel neither cites nor relies on this Declaration at any point and also does not attach the Declaration to the Motion or include it in the Appendix. Thus, the Declaration is not part of the record before me. Plaintiff's counsel similarly does not attach Plaintiff's deposition to the Response in Opposition, so only the portions of her deposition attached to Defendant's Motion for Summary Judgment are before me.

[3] Throughout the course of Plaintiff's employment with CHOP, she was a member of the National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO, District 1199C. Summers Dep. 85:3-19. Accordingly, her employment was governed by the Collective Bargaining Agreement between CHOP and the Union, which included a grievance process for challenging discipline and termination decisions. *See* CBA, Mot. Summ. J., Summers Dep. Ex. 4, ECF 26-6.

(Level 1: counseling for lateness); Ex. K, Dec. 26, 2006 (Level 1: counseling for six unscheduled absences); Ex. L, Dec. 16, 2011 (Level 1: counseling for nine unscheduled absences). Ms. Summers also received counseling related to failure to complete tasks, *see e.g*. Mot. Summ. J., Summers Dep. Ex. M, July 24, 2014 (Level 2: oral warning for not completing job duties); Ex. P, July 8, 2015 (Level 3: written warning for refusing to complete mandatory trainings), as well as unprofessional behavior, *see e.g.* Ex. I, Aug. 1, 2002 (one-day suspension for verbal abuse of patient); Ex. N, Sept. 23, 2014 (Level 2: oral warning for rude behavior); Ex. O, Oct. 16, 2014 (Level 2: oral warning for rude, discourteous, and unprofessional behavior); Ex. Q, Aug. 4, 2015 (Level 4: final warning for insubordination). These counseling sessions occurred and these warnings were issued to Plaintiff before she began reporting to the two individuals she alleges discriminated against her: Holly Sabatino and Tracy Widmer.[4]

    b. *Plaintiff's Supervision by Ms. Sabatino*

In 2017, Plaintiff began reporting to Ms. Sabatino. Sabatino Dep. 9:23-25, Mot. Summ. J., Ex. 5, ECF 26-7; Summers Dep. 88:3-25.

In this lawsuit, Plaintiff alleges that Ms. Sabatino engaged in various acts of racial discrimination against her during her tenure as Plaintiff's supervisor. On October 18, 2019, Ms. Sabatino issued Plaintiff a Level 2: Oral Warning for rude, insulting, and discourteous behavior in violation of the Rules of Conduct. *See* Warning, Mot. Summ. J., Summers Dep. Ex. S, ECF 26-4. At her deposition, Plaintiff testified that she has no recollection of receiving this discipline.

---

[4] Plaintiff objects to the relevance of this disciplinary history on the grounds that "they were issued by supervisors who did not supervise Ms. Summers at any time relevant to this case." Pl. Resp. at 2. CHOP asserts that this history is relevant because "that these disciplines were issued by supervisors other than Ms. Sabatino and Ms. Widmer—the only alleged discriminators in this case—for the same or similar conduct for which Plaintiff received progressive discipline under Ms. Sabatino supports the conclusion that Ms. Sabatino's reasons for issuing Plaintiff the progressive discipline were legitimate and not pretext for discrimination." Def.'s Reply at 6, n. 3.

Summers Dep. 147:22-5.  But the record contains evidence that Plaintiff grieved the discipline through her Union, stating that it was "one big misunderstanding."  Summers Dep. Ex. T.

On July 16, 2020, Plaintiff complained through CHOP's compliance hotline that Holly Sabatino and Tracy Widmer were discriminating against her and other Black SNAs.  McPherson Dep. 12:23-14:17; Pl.'s App. ECF 30; Pl.'s Resp. to Def's. Interrog. No. 8.  Specifically, Plaintiff complained to CHOP Employee Relations Specialist Katie McPherson that Ms. Widmer and Ms. Sabatino told only the Black SNAs that they could not take breaks in the NICU locker room.  Summers Dep. 238:14-24.  Plaintiff generally asserts that "NICU management always had a problem with Plaintiff spending time in the nurse's locker room, but had no issue with her White co-workers doing so."  Pl.'s Resp. to Def's. Interrog. No. 5, ECF 26-4.  In her deposition, Plaintiff stated that she saw a white employee, Megan (last name unknown), who she believes is a SNA, frequently using the locker room for breaks.  Summers Dep. 96:19-97:6.

CHOP asserts that Plaintiff was instructed not to use the locker room for breaks due to COVID-19 mitigation measures.  Sabatino Decl. ¶¶ 6-11.  Following the onset of the pandemic, CHOP determined that the locker room was not large enough to allow for social distancing.  *Id.* ¶¶ 11-12.  Thus, NICU management instructed SNAs that they could no longer take breaks in the locker room and must instead take breaks in designated break areas which had been equipped with plexiglass barriers and were being cleaned more frequently than the locker room.  *Id.*  In her deposition, Plaintiff admitted that instruction not to use the locker room for breaks focused upon the SNAs because they were the only ones who went into the locker room to take breaks.  *See* Summers Dep. 100:10-14 ("Q: Did they tell all employees to take breaks in the break room, though, as opposed to the locker room?  A: "No. They just told the SNAs because we were the only ones going in there").

4

In her complaint to Ms. McPherson, Plaintiff also reported that Ms. Widmer and Ms. Sabatino treated Black employees poorly. She alleges that Ms. Sabatino and Ms. Widmer spoke condescendingly to her and other Black employees but did not speak that way to white employees. *See* Summers Dep. 309:15-310:9; 250:6-9 (reporting that she spoke to Plaintiff "in a condescending way like a child."). When Plaintiff was asked at her deposition to identify non-Black employees who she believed were treated more favorably, Plaintiff stated that she "just think[s] the white people was treated more fairly than the black people." Summers Dep. 311:4-19.

Plaintiff also followed up with Ms. McPherson by email to inform her about an incident the month prior in the NICU where a CHOP leadership employee used the n-word, which Ms. Summers wrote showed "the severity of the situation on the nicu." Summers Dep. 268:1-14. It is undisputed that CHOP terminated the employee for using that racial slur. *Id.* at 270:4-10.

Following Ms. Summers' complaint, Ms. McPherson interviewed both Ms. Sabatino and Ms. Widmer about the complaint against them. McPherson Dep. 25:8-9. Ms. McPherson testified that she informed both Sabatino and Widmer that Plaintiff's complaint against them included allegations of racial discrimination. *Id.* at 27:14-22, 30:19-25, 34:8-19. Both Sabatino and Widmer, however, testified that they did not recall discussing Plaintiff's hotline complaint with Ms. McPherson. Sabatino Dep. 40:19-41:2; Widmer Dep. 28:6-11, Pl.'s App. Part 2, ECF 31.

  c. *Plaintiff's Final Warning and Placement on PIP*

On October 1, 2020, Ms. Sabatino alleges that she asked Plaintiff twice to dispense medications to patients, but that Plaintiff ignored her requests, throwing her hands in the air "in a disrespectful manner" each time and walking away from her. Sabatino Dep. 29:17-21. As a result of this, Ms. Sabatino and Ms. McPherson met with Plaintiff to issue her a Level 3 written discipline

for a violation of Rule C7 (rude and unprofessional behavior). *Id*. at 29:5-8. Ms. Sabatino states that during the meeting she counseled Plaintiff not to ignore or walk away from coworkers who are trying to communicate with her. *Id*. at 32:2-17. According to Plaintiff, Ms. Sabatino "was just telling me all of this stuff and I didn't even know what she was talking about once again and not explaining herself and she just kept talking and wouldn't even let me get a word in edge wise." Summers Dep. 152:11-18. Plaintiff admits that when Ms. Sabatino handed her the written discipline, she stood up, tore the discipline in half, threw the pieces, and left the office. Summers Dep. 151:3-152:8; Sabatino Dep. 25:22-26:3; McPherson Dep. 56:1-8. Ms. Sabatino and Ms. McPherson report that Ms. Summers slammed the door on her way out so loudly that other employees in adjoining offices came out to see if everyone was okay, but Plaintiff denies slamming the door, stating that "the door just closed hard." Sabatino Dep. 37:11-17; Summers Dep. 154:4.

Due to her behavior at this meeting, CHOP placed Ms. Summers on administrative leave. Ms. Sabatino, Ms. McPherson, and Ms. Widmer met with Elise Saunders, Senior Human Resources Business Partner, to discuss next steps. McPherson Dep. 8-9. In these discussions, the group agreed that Plaintiff's "aggressive conduct" at the meeting was a terminable offense in violation of Rule Conduct C22, "which calls for issuance of either a Level 4: Final Warning or termination for 'verbal and/or physical threats, bullying, vicious or malicious words, or forms of aggressive behavior' and provides that '[e]mployees are expected to work in a courteous and professional manner. Disputes should be approached with a calm demeanor with the intent to resolve the issue.'" Mot. Summ. J. at 9 (quoting Sabatino Dep. 33:6-14; McPherson Dep. 64:21-65:2; Rules of Conduct). Initially, Sabatino, Saunders, and Widmer were in favor of terminating Plaintiff's employment. McPherson Dep. 65:22-25. McPherson, noting the recent death of Plaintiff's mother, recognized that termination would be warranted by her outburst, but suggested

6

placing her on a performance improvement plan ("PIP") instead. *Id*. at 63:12-22; 64:21-65:7. The goal of the PIP was to provide Plaintiff with counseling to address her behavior and to improve her working relationship with Ms. Sabatino. *Id*. at 63:12-22; 64:21-65:7. Ultimately, the group agreed to adopt this suggestion and crafted a PIP for Ms. Summers. Sabatino Dep. 33:21-25.

On October 14, 2020, Ms. Sabatino and Ms. McPherson met with Plaintiff and her Union representatives. Sabatino Decl. ¶ 18. During this meeting, CHOP issued her a Level 4 final warning for her violation of Rule 22 and outlined the sixty-day PIP, which required her to take training courses, meet with Ms. Sabatino on a bi-weekly basis, complete assigned job duties, and participate in counseling. *Id.* ¶ 19. The PIP noted that "failure to satisfy the performance expectations as agreed may result in further disciplinary action up to and including termination." PIP, Mot. Summ. J., Summers Dep. Ex. W, ECF 26-4. Plaintiff signed the final warning and the PIP, along with a fresh copy of the October 6 discipline that she had previously torn up. Sabatino Decl. ¶¶ 19-20. She did not grieve the disciplines or the PIP. *Id.*

    d. *Plaintiff's Extended Absence from Unit and Resulting Termination*

On October 17, 2020, Plaintiff returned to work from the administrative leave. Sabatino Decl. ¶ 21. That same day, she was assigned to perform a one-to-one patient safety observation. *Id*. ¶ 22; Summers Dep. 182:2-184:15; 186:3-7. One-to-one safety observations require constant monitoring of the patient by CHOP staff or a family member to ensure that the patient does not pose a safety threat to themselves or to others. Summers Dep. 185:21-186:7; Sabatino Dep. 18:9-13. Plaintiff received approval to take a half-hour break from her one-to-one assignment when the patient's aunt arrived to visit. Sabatino Decl. ¶ 24. Plaintiff did not return to the Unit for over an hour. *Id*. ¶ 25. The nurse assigned to the patient and other staff began to look for her and called the NICU to try to reach her. *Id*. Eventually, she returned. *Id.*

That evening, the charge nurse emailed Ms. Sabatino to report that Ms. Summers had taken an extended break without permission and that the nurses had been looking for her. *Id*. ¶ 22. Ms. Sabatino then investigated this report by speaking with the charge nurse who had supervised Plaintiff, talking to Plaintiff about the incident, reviewing Plaintiff's badge swipe records, and watching security surveillance video from the relevant time period. *Id.* ¶ 23. The badge swipes reflected that she badged into the locker room at 1:53 pm and did not badge into the elevator to return to the Unit until 3:39 pm. *Id*. ¶ 26. The video footage indicated that it was Plaintiff who swiped in and out at those times, not another employee using her badge. Plaintiff admitted in her deposition that it was in fact her in the video at the locations depicted. Summers Dep. 212:2-8, 213:22-23; 215:3-4. Based on this evidence, Ms. Sabatino concluded that Plaintiff took a break of at least one hour and forty-six minutes over her allotted half-hour break time. Sabatino Decl. ¶ 27. During her deposition, Plaintiff maintained that her allotted break time was fifty minutes, not thirty minutes. Summers Dep. 221:23-25. CHOP disputes this. Sabatino Decl. ¶ 28. Regardless, using Plaintiff's timeline, her break was still more than one hour over her allotted time, since "it takes several minutes to get from the 9 South unit to the NICU locker room where Plaintiff swiped her badge, and several minutes to get back to the 9 South unit from the elevator where Plaintiff swiped her badge." *Id*. ¶¶ 29-30.)

In light of her investigation, Ms. Sabatino determined that Plaintiff's extended absence was in violation of Rule of Conduct C17, which provides that "[e]mployees are expected to be in their assigned work areas except for scheduled (assigned) lunch or other breaks. Any unauthorized absence from their assigned work area (as defined by the supervisor) of one hour or more will warrant a <u>Level 4: Final warning or Termination</u>." Rules of Conduct at 9 (emphasis in original); Sabatino Decl. ¶ 31. At this point, Plaintiff had already received a Final Warning three days prior

and was also under a PIP. Given this context, Ms. Sabatino, in consultation with Ms. Saunders and Ms. Widmer, decided to terminate Plaintiff's employment. Sabatino Decl. ¶ 29.

On November 17, 2020, Ms. Sabatino met with Plaintiff and a Union delegate to inform her of her termination. Sabatino Decl. ¶ 33. Plaintiff initialed and the delegate signed the termination notice. Termination Notice, Mot. Summ. J., Summers Dep. Ex. X, ECF 26-4. Plaintiff filed a grievance through the Union to contest her termination. Summers Dep. 195:11-20; 196:8-10. The Union requested the badge swipe and video records, which CHOP provided to them. Sabatino Decl. ¶ 34. During the grievance process, Plaintiff never complained of race discrimination. Grievance Form and Memo, Mot. Summ. J., Summers Dep. Ex. Z and Ex. DD, ECF 26-4. CHOP ultimately denied her grievance and Plaintiff did not appeal. Grievance Memo, Summers Dep. Ex. DD.

In this suit, Plaintiff now contends that her termination was racially discriminatory. Defendant moves for summary judgment, arguing that there is no evidence that her termination was motivated by racial discrimination. Mot. Summ. J., ECF 26.

**II.     Standard of Review:**

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

**III.    Discussion:**

    **a.  Race Discrimination Claim**

Plaintiff's claim arises under § 1981. A plaintiff raising a claim of discrimination under § 1981 must allege facts showing "(1) that [she] belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more

9

of the activities enumerated in § 1981." *Pryor v. Nat'l Collegiate Athletic Ass'n.,* 288 F.3d 548, 569 (3d Cir. 2002) (citing *Brown v. Philip Morris Inc.*, 250 F.3d 789 (3d Cir. 2001)). In the context of employment discrimination claims, the Third Circuit has explained that "the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Brown v. J. Kaz, Inc.,* 581 F.3d 175, 181-82 (3d Cir. 2009).

Plaintiff attempts to state a claim of race discrimination under the pretext theory set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To state a claim under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination by showing: 1) membership in a protected class; 2) qualification to hold the position; 3) an adverse employment action under 4) "circumstances that could give rise to an inference of discrimination." *Makky v. Chertoff,* 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas,* 411 U.S. at 802).

Once the plaintiff has established a *prima facie* case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802-03. At this time, the employer must demonstrate "evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perski*, 32 F.3d 759, 763 (3d Cir. 1994). If the employer is able to satisfy his burden of production, the presumption of discriminatory action raised by the *prima facie* case is rebutted and the burden shifts back to the plaintiff to establish that the employer's legitimate, non-discriminatory reason was merely pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804.

To prevail on her § 1981 claim, Plaintiff must prove that race was the but-for cause of her termination. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014-15 (2020). This is a higher causation burden than exists in the context of a Title VII claim,

which requires that race be a "motivating factor" in the termination. 42 U.S.C. § 2000e-2(m); *Heredia-Caines v. Lehigh Valley Hosp., Inc.*, 580 F. Supp. 3d 114 n. 1(E.D. Pa. 2022) (discussing the difference in standards).

Here, Plaintiff alleges that her termination was racially discriminatory. In response, CHOP argues that Plaintiff has failed to make out a *prima facie* case, as there is no evidence to support an inference of racial discrimination. In the alternative, it argues that it has offered a legitimate, nondiscriminatory reason for its employment decision not to terminate Plaintiff and that she cannot show that its proffered reason is pretextual.

### a. Plaintiff Does Not State a Prima Facie Case of Race Discrimination

Plaintiff has failed to create a genuine issue of material fact as to whether her termination was the result of race discrimination. Plaintiff, as the party opposing summary judgment, must point "to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Fuentes*, 32 F.3d at n. 1. Plaintiff satisfies the first three elements: she is a member of a protected class, qualified for the position, and suffered an adverse employment action.

Plaintiff's *prima facie* case founders on the fourth element. There is no evidence, beyond her own speculation, that her termination was racially discriminatory. *See Wiest v. Tyco Elecs. Corp.,* 812 F.3d 319, 328 (3d Cir. 2016) (stating that "conjecture and speculation will not create a genuine issue of material fact sufficient to withstand the grant of summary judgment").

Here, Plaintiff points to no similarly situated comparators who were treated more favorably by CHOP. Instead, to support her claim, Plaintiff broadly asserts that Black SNAs were told not to use the locker room but white SNAs were not. As evidence, Plaintiff states that on one occasion, Ms. Widmer came into the locker room when Plaintiff and two other Black employees were taking

a break there and asked if there was a party going on in the locker room. Summers Dep. 91:21-92:6. After that instance, Plaintiff never saw the other two SNAs taking a break in the locker room, as they began using the designated break room. *Id.* at 99:2-22. One other time, Ms. Widmer followed Ms. Summers into the locker room and when she saw her sit down, told her to get back to work. *Id.* at 93:7-14. Finally, Plaintiff alleges that Ms. Sabatino and Ms. Widmer sometimes looked into the locker room to see who was inside or talked outside of the locker room. *Id.* at 94:19-24. Critically, Plaintiff admitted at her deposition that Ms. Sabatino and Ms. Widmer told all SNAs that they should not use the locker rooms for breaks, not just the Black SNAs. *Id.* at 100:10-22. And while Plaintiff asserts that it was only the SNAs, the majority of whom are Black, and not other employees who were told not to use the locker room for breaks, such behavior raises no inference of discrimination where Plaintiff also admits that the SNAs "were the only ones going in there," and thus, the only group that would require a warning not to use the space for breaks.[5] *Id.*

As further evidence of disparate treatment, Plaintiff states that she saw a white employee named Megan taking breaks in the locker room frequently. As a threshold matter, Plaintiff does not know this employee's last name and Ms. Widmer does not know of any white SNA named Megan. Summers Dep. 97:2-6; Widmer Dep. 73:15-17; *see Caple v. Daiichi Sankyo U.S. Pharma, Inc.*, No. 10-1271, 2011 WL 6412073, at *9 n.14 (E.D. Pa. Dec. 20, 2011) (finding plaintiff's purported comparator insufficient where plaintiff could only remember one person's first name and had no other identifying information). Setting aside these deficiencies, Plaintiff further

---

[5] Relatedly, there is no evidence in the record that the underlying decision not to allow employees to use the locker room for breaks was discriminatory or meant to target the majority Black SNA population. Rather, the record reflects that CHOP was responding to the demands of the pandemic. Plaintiff does not dispute that the locker room's small size did not allow for social distancing and that the room was not cleaned as frequently as other spaces.

admitted that she never saw Ms. Sabatino or Ms. Widmer and Megan in the locker room at the same time. Summers Dep. 101:24-102:2. So, there is no evidence in the record that Ms. Sabatino or Ms. Widmer were aware that Megan was taking breaks in the room or that they were freely allowing a white employee to take breaks in the locker room while prohibiting Black employees from doing the same. In response to an interrogatory asking Plaintiff to identity similarly situated white Nursing Assistants who were treated differently, Plaintiff vaguely alludes to other "white co-workers," but does not provide any further names or information as to who these alleged white co-workers are. She testified that white RNs were permitted to spend time in the locker room, Summers Dep. 231:19-22, but could not identify any. *Id*. at 97:15-22. It should also be noted that this testimony about RNs is inconsistent with Plaintiff's testimony that only SNAs were using the locker room for breaks. And at her deposition, when asked for a list of people who were treated more favorably than her, she stated "I just think the white people was treated more fairly than the black people." Summers Dep. 311:4-19. Without more, Plaintiff's own speculative, conclusory, and unsupported assertions are simply insufficient to raise an inference of disparate treatment. *See e. g., Mojica v. Advance Auto Parts, Inc*., No. 15-1418, 2016 WL 107844, at \*5 (E.D. Pa. Jan. 11, 2016) (finding plaintiff failed to establish a *prima facie* case where "[t]he only comparators Plaintiff purports to identify with respect to any of these situation[s] are unidentified 'white guys'").

Plaintiff further asserts that Ms. Sabatino and Ms. Widmer spoke to her and other Black employees in a condescending manner. This assertion has even less evidentiary support than the claim of disparate treatment related to the locker room discussed above. Plaintiff identified no one who was treated more favorably, other than "white people." Indeed, though Plaintiff asserts that their speech was "condescending," this allegation is vague and conclusory in that the record

includes no examples of the type of language used. *See Flagg v. Control Data*, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992), *aff'd,* 998 F.2d 1002 (3d Cir. 1993) ("Conclusory allegations of generalized racial bias do not establish discriminatory intent."). In the context of a *prima facie* case, "a plaintiff's own assertion of racial animus does not give rise to an inference of unlawful discrimination." *Williams-McCoy v. Starz Encore Grp.*, No. 02-5125, 2004 WL 356198, at *7 (E.D. Pa. Feb. 5, 2004) (citing *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 490-91 (E.D. Pa. 1999)).

Finally, Plaintiff points to the June 2020 incident wherein a member of Defendant's leadership team used the n-word as evidence of the racist atmosphere in the NICU. This remark, reprehensible as it was, is insufficient to raise an inference that Plaintiff's termination was racially discriminatory. First, the individual who made the comment never supervised Plaintiff nor played any role in her termination. Second, the remark was made five months prior to Plaintiff's termination and there is no evidence linking it to Plaintiff's termination. Most importantly, the record reflects that, upon learning of the deeply offensive remark, CHOP promptly terminated the employee.

> *b. Even if Plaintiff Could Establish a Prima Facie Case, there is Insufficient Evidence from Which a Reasonable Juror Could Conclude that Her Termination was Pretextual*

Moreover, even if Plaintiff could establish a *prima facie* case of discrimination in her termination, a reasonable jury could not find that Defendant's proffered reason for firing her was pretextual. Once a plaintiff establishes a *prima facie* case, Defendant must answer with legitimate, nondiscriminatory reasons for its action. *See Fuentes*, 32 F.3d at 764. If Defendant meets this "relatively light burden," the burden of production shifts back to the plaintiff who must show that each of the employer's reasons are pretextual. *Id.* at 763. To demonstrate pretext and defeat summary judgment, the plaintiff must then identify evidence "from which a factfinder could

14

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

In this case, CHOP's proffered reason for termination was that Ms. Summers took an extended break in violation of CHOP's policy, a violation that occurred a mere three days after Plaintiff had been issued a PIP, and shortly after CHOP had exercised its discretion to retain her following a previous violation. The factual basis for its action is confirmed by security footage and swipe card entries. Defendant has clearly met its burden.

Plaintiff raises multiple arguments why this reason is pretextual. First, Plaintiff asserts that there is a dispute as to the length of time that Plaintiff was away from her work area on October 17, 2020. Pl.'s Resp. at 11-13. This argument fails because, while it is true that CHOP asserts that her allotted break was 30 minutes and Plaintiff testified that her break was 50 minutes, under either scenario, Plaintiff was away from her work area for an hour or more in violation of Rule of Conduct C17, which provides that termination is a possible consequence for its violation. At her deposition, Plaintiff confirmed the timing of the badge swipes and that it was her on the video footage. Although Plaintiff asserts that she neither recalls what time she left nor when she returned, stating only that she returned from her break "fifty minutes later," her conclusory testimony is in direct conflict with video surveillance and badge swipe evidence, failing to raise a genuine dispute of material fact. Summers Dep. 222: 1-13. And even if CHOP were mistaken as to the timing of Plaintiff's break, there remains the fundamental fact that there is no evidence in the record, beyond Plaintiff's speculation, to raise an inference of discriminatory animus. *See Fuentes,* 32 F.3d at 765 ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

15

discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

Next, Plaintiff argues that her extended break did not endanger patient safety because the patient's aunt was present throughout Plaintiff's break, so Plaintiff did not violate CHOP's one-to-one policy and termination was not required. Pl.'s Resp. at 12. CHOP responds by reiterating that it did not terminate Plaintiff for endangering patient safety: rather, it terminated her for violating Rule C17, which prohibits "unauthorized absence[s] from [the employee's] assigned work area" of an hour or more. Def.'s Reply at 4, ECF 32.

Plaintiff also argues that there was no CHOP policy that required Ms. Summer to obtain advance permission from the charge nurse to be away for an extended period. Pl.'s Resp. at 12. Plaintiff's bald assertion is in direct contradiction with the evidence in the record, which unambiguously provides that unauthorized extended absences are in violation of Rule C17. A supervisor or charge nurse must authorize a longer absence. Plaintiff admits that she did not get authorization from the charge nurse on duty for her extended break. Summers Dep. 186:22-23. Plaintiff cites Ms. Sabatino's deposition as indicating that CHOP had "shifting explanations for why Ms. Summers was terminated." Pl.'s Resp. at 13; *see also* Sabatino Dep. 23:14-20 ("Q. What is against your rules of conduct? A. For someone to be away from their workplace for greater than their allotted time for a break without communication with the charge nurse of the unit."). Contrary to Plaintiff's characterization, Ms. Sabatino's response is entirely consistent with Rule C17 and CHOP's proffered reasons for termination.

Plaintiff next posits that "Ms. Sabatino and Dr. Widmer, both of whom knew in July 2020 that Ms. Summers had made a compliance hotline complaint of discrimination against them, wanted to terminate Ms. Summers directly after the October 6, 2020 meeting but were thwarted in

16

their efforts to do so by Ms. McPherson, and seized upon the October 17, 2020 incident to terminate her." Pl.'s Resp. at 12. Plaintiff makes much of the fact that the record contains a dispute as to whether or not Sabatino and Widmer were aware of Plaintiff's complaint against them. This dispute is not material, however, absent any indication that her termination was racially discriminatory. The record reflects that all parties agreed that the October incident was a terminable offense, but, following conversations with Ms. McPherson about Plaintiff's recent bereavement, the group ultimately determined to give Summers another chance. This sequence of events, rather than giving rise to an inference of discrimination, reflects a willingness to support Plaintiff's employment.

Finally, Plaintiff points to the June 2020 racial slur incident as "indicative of the racial atmosphere in the NICU." Pl.'s Resp. at 12. As discussed above, this incident is insufficient to raise an inference of discriminatory animus, where the speaker played no part in her termination and CHOP fired the offender.

Ultimately, even when the facts of this case are viewed in the light most favorable to the Plaintiff, there is ample evidence in the record from which a factfinder could believe Defendant's articulated reason. Given this, Plaintiff has failed to point to record evidence from which a reasonable jury could find CHOP's explanation "unworthy of credence." *Fuentes*, 32 F.3d at 765. Absent any evidence to support it, Plaintiff's speculation that her termination was discriminatory does not suffice to establish pretext. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 415 (3d Cir. 1999). Plaintiff has failed to show that CHOP's "proffered reasons are weak, incoherent, implausible, or so inconsistent that a reasonable factfinder could rationally find them unworthy of credence" or that "the employer's articulated reason was not merely wrong, but that it was so

17

plainly wrong that it could not have been the employer's real reason." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 800 (3d Cir. 2003) (cleaned up).

## IV. Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted. An appropriate order follows.

  /s/ Gerald Austin McHugh
United States District Judge